# CHARLESTON.

## Skidmore *v.* West Virginia & P. R. Co.

Submitted June 15, 1895—Decided Nov. 29, 1895.

1. RAILROAD COMPANIES—INJURY TO EMPLOYE.

Where a section hand in the employ of a railroad company, in company with other section hands, is engaged in clearing away a wreck under the supervision of a section boss and the supervisor of the road, and it is thought necessary to move a tender which lies on its side near the main track farther from said track, and said tender inclines a little towards the main track, but nothing in its appearance indicates that the bottom of said tender has been broken loose from the body, and neither the section boss nor supervisor could by ordinary diligence discover any such fracture, or any separation from the main body, and while the section hands are engaged in moving such tender the bottom falls out and injures said section hand, he is not entitled to recover from said railroad company damages for the injury so received.

2. RAILROAD COMPANIES—ASSUMPTION OF RISK.

Where a foreman and his assistants have equal knowledge of the danger accompanying an act about to be done, even if the foreman requests its performance, and injury ensues to the assistant, the employer can not be made liable. Notwithstanding the request, the assistant can comply or not, as he chooses, and if he does comply, he takes his chances of the perils surrounding the situation.

3. RAILROAD COMPANIES—IGNORANCE OF SERVANTS—KNOWLEDGE OF MASTER.

It is only when the servant is ignorant of the impending danger, and the employer is not, and the employer fails to warn the servant of such danger, that the master's liability attaches.

4. RAILROAD COMPANIES—ASSUMPTION OF RISK—OBVIOUS DANGER.

When one enters upon a service, he assumes to understand it, and takes all the ordinary risks that are incident to the employment; and where the employment presents special features of danger, such as are plain and obvious, he also assumes the risk of those.

5. RAILROAD COMPANIES—LATENT DEFECT.

Where the danger consists in some latent defect, which is not apparent by the use of ordinary diligence on the part of the mas-

ter, and a servant in performing his work is thereby injured, when he had the same chances of observation as the master, no liability attaches to the master.

JOHN BRANNON and JOHN A. HUTCHINSON for plaintiff in error, cited 54 Am. & Eng. R. Cas. 158, 238, 328, 640; Wood, Ry. Law, 1066, note; 48 Am. & Eng. R. Cas. 381, 376-77; McKinney, Fel. Serv. § 67; Beach, Ry. Dig. §§ 13, 53, 59, 88, 142; Bailey, Master's Liability, Fel. Serv. 239, 236, 237, 242, 283, 318, 319; 60 Am. & Eng. R. Cas. 75, 81; McKinney, Fel. Serv. 18.

W. E. HAYMOND for defendant in error, cited 28 W. Va. 610, pt. 3, Syl.; 27 W. Va. 145-6-7, 285; 24 W. Va. 37-8; 31 W. Va. 142-43; 37 W. Va. 606, 613; 30 W. Va. 798; 33 W. 135-40; 39 W. Va. 273 4; 78 Va. 745; 2 Am. St. Rep. 82.

ENGLISH, JUDGE:

This was an action of trespass on the case, brought by Henry T. Skidmore against the West Virginia & Pittsburgh Railroad Company in the Circuit Court of Braxton county. This action is predicated upon the following facts, which are disclosed in the record:

The plaintiff was a section hand, working for the defendant on its line of railroad. On the 19th day of April, 1893, a wreck occurred near Centralia, in Braxton county, and the plaintiff was ordered by the section boss to go to the place where the accident occurred and assist in clearing up the wreck. The tender belonging to the wrecked train had become detached from its trucks, and was lying on its side near the main track, with the bottom towards the track and inclined in that direction. Mr. Rebrook was in charge of the wrecking party as foreman. Mr. Rebrook said that this tender would look better if it was moved around a little; and under the direction of Mr. McIntyre, who was a section boss, the plaintiff and others went with said McIntyre to move around said tender. The plaintiff lifted at the side, while the other hands were assisting at different points about the tender; each one selecting his own place at which to work. They were working with crowbars and a jack-

screw under the corner, when the bottom of the tender became detached from the remaining portion thereof, and fell over on the plaintiff, breaking both his legs, and hurting his side and back.

The defendant demurred to the plaintiff's declaration, and each count thereof. The demurrer was overruled by the court. The defendant pleaded not guilty, and issue was joined thereon; and on the 6th day of September, 1894, the case was submitted to a jury, who found a verdict in favor of the plaintiff for six thousand dollars, and in response to several special interrogatories which were propounded to them, as follows: (1) "Was there anything in the appearance of the tender at or before the time of the accident, or when the plaintiff and others applied their crowbars to turn the end of such tender further from the main track of defendant, to suggest danger in removing such tender, or attempting to turn said tender, to a person of ordinary prudence?" Answer: "There was." (2) "If there was such appearance, or if the situation or condition of the tender at or just before the time of the accident was such as to indicate that it would be dangerous to move, or try to move, the same with crowbars, was such appearance, or were such condition and situation as obvious to the plaintiff as to Rebrook and McIntyre?" Answer: "No." (3) "If the danger in so turning said tender was not apparent, then could said danger have been discovered either by Rebrook or McIntyre by the exercise of reasonable care and diligence?" Answer: "Yes."

The defendant moved the court to set aside the verdict and grant it a new trial because the same was contrary to and without evidence, contrary to the instructions of the court given to the jury on behalf of the defendant, for error in giving to the jury the instructions asked by the plaintiff, and for error of court allowing the questions propounded by the plaintiff to be given to the jury for answer thereto; which motion to set aside the verdict of the jury was overruled by the court, and judgment was rendered upon the verdict.

The instructions asked for by the plaintiff read as follows: "Plaintiff's Instructions. (1) The court instructs

the jury that it was the duty of the defendant to use all reasonable care and dilligence for the safety of its employes, and that the plaintiff, in entering into the service of the defendant, had a right to presume that the defendant had discharged this duty, and the plaintiff, in entering the employment, is presumed to have assumed only those ordinary risks connected with his duties which would exist after the discharge by the defendant of the duty above set out; and if the jury believe, from the evidence, that the defendant failed to discharge such duty, and that the injury complained of resulted to the plaintiff from such failure, without fault or negligence on the part of the plaintiff at the time of the injury, which ordinary care and prudence on his part could have avoided, then the defendant is liable for such injury. (2) The court instructs the jury that if they believe, from the evidence, that the plaintiff, while acting as a section hand in the employment of the defendant, was required by the defendant to leave his section, and go with a wrecking crew, and assist in the removal of a wreck at Centralia, and, when there, was ordered by the defendant to assist in the removal of a car, commonly called a 'tender,' then so near the defendant's track as to obstruct the same, and while obeying said order received the injury complained of, from being struck by the bottom of the tender falling from the main portion thereof upon him, and that the situation of the said tender was dangerous, and known to be such by the foreman of the wrecking crew, or might have been known to him by the use of ordinary care and diligence, and that to him had been assigned by the defendant the duty of having said tender and other wreckage removed from defendant's railroad track, and that plaintiff did not know of such danger, and was not warned thereof by said foreman, and that from his situation he could not be presumed to have known, by proper care and caution on his part, of such danger, then the knowledge of such foreman and his negligence (if the jury believe, from the evidence, there was such negligence in requiring the said plaintiff to work in the removal of said tender, without warning him of his peril, or in failing to use care and dilligence to ascertain and make known such

peril) was the negligence of the defendant. (3) When a
railroad company puts a superintendent, foreman, or other
employe in its place, to discharge some duty which it owes
to its servants and employes, as to such duty such superin-
tendent or other employe is not a co-servant, but the repre-
sentative of the company, and as to such duty the company
is bound by the acts or omissions of such middleman the
same as though the acts had been done or omitted by the
company itself." "(5) The court instructs the jury that if
they find the defendant guilty, they are, in estimating the
damage, at liberty to consider the health and condition of
the plaintiff before the injury complained of, as compared
with his present condition in consequence of said injuries,
and whether said injury is in its nature permanent, and
how far said injury is calculated to disable the plaintiff
from engaging in those pursuits and employments for
which, in the absence of said injury, he would have been
qualified, and also the physical suffering to which he was
subjected or may be subjected by reason of said injuries,
and to allow such damages as in the opinion of the jury
will be fair and just compensation for the injury which the
plaintiff has sustained. (6) The court instructs the jury
that if they should believe, from the evidence, that the
place at which plaintiff worked at the tender in question
was a place of danger, which was apparent to him, and
should have been seen by him had he been careful, but
that he, in obedience to the order and direction of the
agent of defendant having authority, as in other instruc-
tions set out, to direct and order him to work, and where
to work, went to work at such place of danger without no-
ticing the danger, and that, after he so went to work at
said tender, such agent or foreman of the defendant had
notice of the danger, and saw the danger, or that his at-
tention was called thereto, and he could have seen the dan-
ger by the use of ordinary diligence, and have warned the
plaintiff, and did not warn the plaintiff thereof, and that in
consequence thereof the plaintiff was injured, then the de-
fendant is liable. (7) The court instructs the jury that it
was the duty of the defendant to have furnished and used
good and sufficient tools, machinery, and appliances neces-

sary for the safety and security of its employes engaged in the removal and clearing up the wreckage at Centralia; and if the jury believe, from the evidence, that defendant did not furnish and use at said wreck such safe and necessary tools and appliances, and that by reason thereof the bottom part of the tender mentioned in evidence fell upon plaintiff and injured him, and that the plaintiff at the time was exercising ordinary care and prudence as the servant and employe of the defendant, and that he was in the discharge of his duties as such at the time the injury occurred, and was not aware of his danger, then the jury should find for the plaintiff such damages as he has sustained in consequence thereof. (8) The court instructs the jury that it was the duty of the defendant to use ordinary care to ascertain the safety of the condition of the tender mentioned, as to its liability to injure the servants of the defendant in working thereat, before ordering them to work at it in attempting to remove it; and if the jury believe, from the evidence, that the tender at that time was in unsafe condition to so work at, and that the defendant, by its agent or foreman, did not use ordinary care to ascertain its condition, and that he ordered or directed the plaintiff, with other servants of the defendant, to work thereat, and attempt to remove said tender, and that by the use of ordinary care on the part of said foreman he could have discovered the unsafe condition aforesaid of said tender, and that the plaintiff did work in the removal of said tender, in obedience to such order and direction, and that the plaintiff was not aware of his danger, and that such danger was not apparent in the position which he occupied, and that the plaintiff sustained the injury complained of while so working, and was using due care and precaution on his part, then the plaintiff is entitled to recover in this action." And to the giving of said instructions numbered 2, 6, 7 and 8 the defendant objected, but the court overruled said objection, and gave said instructions numbered 2, 6, 7 and 8, and gave also said instructions 1, 3, and 5; and to the overruling of its objections the defendant excepted.

The following instructions were given to the jury at the instance of the defendant, and against the objection of the plaintiff:

"Defendants Instructions. (1) The jury is instructed that the burden of proof in this case to show negligence on the part of the defendant is devolved upon the plaintiff. (2) The jury is further instructed that, in the selection of its employes and servants, only reasonable care is imposed upon the defendant, and that in the selection of persons for the discharge of particular duties only sufficient skill and ability, with reasonable and ordinary care, are required on the part of persons selected to discharge such duties, and the skill and ability, as well as care on the part of persons so selected, are to be measured by the nature of the duties imposed upon them. (3) The jury is further instructed that, in the selection of machinery and appliances by the defendant for the use of its employes, it is not required that such machinery and appliances shall be of the best or of the latest improved character for the purpose, but it is sufficient for them to be of such character as is reasonably safe or adequate for the purpose for which they are to be used. (4) The jury is further instructed that if it finds from the evidence that at the time, or just before, the occurrence of the accident in question, there was nothing in the appearance of the tender of defendant to indicate danger to a person of ordinary knowledge, prudence, and observation, such as would be required in a person to discharge the duties of the positions then held by the witnesses Rebrook and McIntyre, but that to a person who was skilled in the building or construction of locomotives or tenders, such appearance would indicate danger in attempting to move such tender with crowbars in the manner it was attempted to be moved at the time of the accident, then the jury should find for the defendant, unless the jury should believe that said Rebrook and McIntyre, or either of them, possessed such knowledge of the construction of said tender as to render it obvious or observable to them, or him, that it would be dangerous to attempt to move such tender with crowbars, or unless it believes, from a preponderance of the evidence, that the defendant was negligent in some other respect in the instructions just given for the plaintiff, and that such negligence was the proximate cause of the injury. (5) The jury is

further instructed that if, at or before the accident in question, in which the plaintiff was injured, the appearance of the tender was such as to indicate danger to a person of ordinary prudence, and that such appearance was as obvious to the plaintiff as to the witnesses Rebrook and McIntyre, then the jury should find for the defendant, unless it believes, from a preponderance of the evidence, that the defendant was negligent in some other respect in the instructions just given for the plaintiff, and that such negligence was the proximate cause of the injury. (6) If the jury find from the evidence that the defendant exercised reasonable care in the selection of the witness Rebrook for supervisor of its road, and of the witness McIntyre as section foreman, and that they, or either of them, provided, for the work of turning the end of the tender, reasonably safe appliances or instruments for such removal, then there was no absolute guaranty against accident in the use of such appliances or instruments, and the jury should find for the defendant, unless it believe, from a preponderance of the evidence, that the defendant was negligent in some other respect in the instructions just given for the plaintiff, and that such negligence was the proximate cause of the injury. (7) In order to impeach the witness Koozer for truth and veracity it is not necessary to show that he had been sworn as a witness at any time, before a court or otherwise. (8) The measure of care which a master must take to avoid responsibility for injury to his servants is that which a person of ordinary prudence and caution would use if his own interests were to be affected and the whole risk was his own."

The defendant, by its counsel, took several bills of exception to the rulings of the court, and the same are made part of the record, and applied for and obtained this writ of error.

The demurrer is not insisted on in argument, and is presumed to have been waived. The second assignment of error is as to the action of the court in overruling the objection of the defendant to instructions Nos. 2, 6, 7, and 8, given to the jury on motion of the plaintiff. As to instruction No. 2, it involves the question of negligence on

the part of Rebrook, the supervisor, and McIntyre, the section boss, assuming that they had knowledge of the danger which would attend the moving of the end of said tender, and, having such knowledge, failed to communicate it to the plaintiff, or to warn him of his peril. Now, this question of negligence is a mixed question of law and fact, and in considering it we must take it for granted that both Rebrook, the supervisor, and McIntyre, the section boss, were men of experience in railroad matters, occupying the positions they did, and that they were acquainted with the construction of railroad tenders, and were aware of the strong and compact manner in which they were bound and bolted together, to fit them for carrying fuel and water for the engine. This tender was lying on its side, and Mr. Rebrook, in his testimony, states his experience, since he was quite a boy, in running on railroads and constructing them; had seen several tenders wrecked on former occasions, but never saw one that the bottom fell out; and when asked what his opportunities were of observing the appearance of the tender after it had been drawn to the place and position it occupied when the accident occurred, replied: "Well, I had been working there with the men, you know, and I was right up against it, part of the time standing with my hand on the bottom of the tender. I was standing there, and working there." So that if it be true he ordered the men to go and move the tender, or to work there, he ordered them only to go where he had been himself, and he says: "I saw nothing to indicate danger in any way; something I had never seen before, or never heard of until I saw it there" (meaning, I suppose, the bottom of the tender falling out). He also states that he had seen quite a number of wrecks; worked as a hand at them. He was also asked if he had ever seen any tenders wrecked before, and replied, "Yes, sir; several of them." And when asked, "Did you ever see one that the bottom fell out?" replied, "Never did; that was the first I ever saw." Mr. Rebrook confirms Mr. McIntyre's statement that he remarked in the presence of McIntyre that the tender would look better if the end was moved around, and then he went on to the switch, between one hundred and two hundred

yards away, and Mr. McIntyre went the other way. Now, the plaintiff, on cross-examination, was asked if he did not remember that, on going to work at this tender, he said, "Come on, boys, quick; let's do this, and get our dinners, and get something to eat." And he at first stated that he did not remember about that, but when asked, "Don't you remember that it was so remarked?" answered, "Yes, sir; some one did remark that, but I don't know who it was." So it will be perceived it was dinner time. It was thought throwing the end of this tender around would be a small job, and all hands went at it, in a hurry, to get through with it and go to dinner; and it is highly probable that this little circumstance caused them to work at this tender with more hurry and less care and caution than they would have done under other circumstances. Mr. McIntyre testifies that he could see nothing wrong with the tender when they went to work at it. If the bolts were severed that held the bottom on the tender, this defect was not perceptible, and it does not appear that it could have been discovered by inspection. The bottom was still in place, and the fracture of the bolts may have been, and most probably was, concealed by the iron bottom and wood through which it passed; and to the boss and to the men, who had the same opportunity of observation that he had of discovering that the fastenings of the bottom to the tender were broken, no such fracture was perceptible, and no danger was apparent —the supervisor having worked, a few minutes before, in the very place where the plaintiff was injured. I therefore conclude that the court was not warranted in giving said instruction No. 2 to the jury at the instance of the plaintiff, because it was misleading, and because the facts therein stated were not fairly deducible from the evidence in the case, there being nothing in the evidence tending to show that the bottom of said tender was dissevered from the remainder of the tender, and because the plaintiff had every opportunity that the supervisor or section boss had to make such discovery.

The sixth instruction given at the instance of the plaintiff assumes that the agent of defendant went to work at such place of danger without noticing the danger, and that,

after he went to work, such agent or foreman of the defendant saw the danger, and had notice of it, and could have seen the danger by use of ordinary diligence, and warned the plaintiff, and did not warn him thereof, or that the evidence in the case tends to support such assumption, when there is no evidence showing that the section boss or supervisor showed the plaintiff or any of the other men where to work—that is, at what part of the tender to work —but, on the contrary, they went there in a hurry, and selected their own positions, and the boss with a crowbar in his hands, was assisting them at their work, and when the bottom of the tender separated from the remaining portion the boss for the first time saw the impending danger, and called to the men to "look out."

The seventh instruction told the jury that it was the duty of the defendant to have furnished and used good and sufficient tools and appliances necessary for the safety and security of its employes engaged in the removal and clearing up of the said wreck, and that if they believed, from the evidence, that it did not use such tools and appliances, and that by reason thereof the bottom of said tender fell upon the plaintiff and injured him, and that plaintiff was in the discharge of his duties at the time of the injury, and was not aware of the danger, and was exercising ordinary care and prudence as the servant and employe of defendant, they should find for the plaintiff. This instruction was calculated to mislead the jury, and should not have been given, for the reason that the evidence shows that the tools used were such as are ordinarily used in clearing up such wrecks, and there is no evidence showing that the character of the tools used had any influence or effect in causing the accident. The bottom of the tender, to all outward observation, was apparently in place, and no care or prudence on the part of the plaintiff or section boss would have discovered it; yet the bolts that held it must have been broken when it was thrown from the track, and not by the crowbars used by the plaintiff and the other hands, and when they commenced to move the tender the bottom fell out. The accident does not appear to have been occasioned by want of care on the part of the boss of the section hands,

but it was caused, most likely, by the jar when the tender left the track. The tender, lying on its side, appeared to be sound. The supervisor and boss so regarded it, and worked where it could have fallen on them just before the accident; and if they had directed the men where to work, they would only have sent them where they had gone themselves, unconcious of any danger, and said instruc tion should not have been given. Instruction No. 8 should have been refused for the same reason. The court gave the instructions prayed for by the defendant.

The jury were required, in addition to their general verdict, to make specific answers to the following questions: (1) "Was there any thing in the appearance of the tender at or before the time of the accident, or when the plaintiff and others applied their crowbars to turn the end of such tender further from the main track of defendant, to suggest danger in removing such tender, or attempting to turn said tender, to a person of ordinary prudence?" To which question the jury answered, "There was." (2) "If there was such appearance, or if the situation or condition of the tender at or just before the time of the accident was such as to indicate that it would be dangerous to move, or to try to move, the same with crowbars, was such appearance, or were such condition and situation, as obvious to plaintiff as to Rebrook and McIntyre?" To which question the jury answered, "No." (3) "If the danger in so turning said tender was not apparent, then could such danger have been discovered either by Rebrook or McIntyre by the exercise of reasonable care and diligence?" To which question the jury answered, "Yes." The defendant moved the court to set aside the verdict of the jury because the same was contrary to and without evidence, and was contrary to the instructions given by the court to the jury in be- half of the defendant, and for error in giving the instructions to the jury asked for by the plaintiff, and for error of court in allowing the questions propounded by the plaintiff to be given to the jury for answer thereto; which motion was overruled by the court, and this action of the court is assigned as error.

Now as to the character of the danger which the plain-

tiff encountered in performing this work, it was no more apparent to the skilled and experienced supervisor and section boss than it was to the plaintiff or to the humblest and most uninformed section hand engaged about the work. If the bolts that held the bottom on were severed, as they must have been, between the tap and the nut, no eyes could penetrate the iron and the wood that surrounded the bolt, and it could not be expected or required that the section boss should chip in to the bolt or cut through the iron and destroy the tender to ascertain whether the bolts were sound or broken before going to work to remove the tender from its proximity to the main track. Upon this question Bailey on Master's Liability for Injuries to Servants, on page 111, states the law thus: "The servant not being familiar with his premises or appliances, if there are dangers latent or not exposed, and of which the master has knowledge, and the servant has not, either actual or presumed, they must be made known to the servant. * * * Of course this rule would not require the employer to become responsible to his servant for any injury he might receive while in the employment of the master resulting from those dangers which are the subject of common knowledge, or which could readily be seen by ordinary observation. Such risks, as hereafter shown, and the dangers therefrom, are always assumed by the servant when he engages in the service." Upon this question the supreme court of New Jersey, in the case of *Foley* v. *Electric Light Co.*, 54 N. J. Law, 411 (24 Atl. 487) holds that, "when one enters upon a service, he assumes to understand it, and takes all the ordinary risks that are incident to the employment; and where the employment presents special features of danger, such as are plain and obvious, he also assumes the risk of those." Also, that "the cases rigidly hold the doctrine that the servant takes upon himself such definite and determinate risks as are obvious, and no action will lie against the master for injuries to the servant in such cases, where he has not induced the servant to remain by a promise to remove the danger." There can be no question that the result shows that these section hands were working in a dangerous place, and it also shows that the super-

visor and section boss had been working in the same place; but it is not the mere existence of danger in the employment that fixes a liability upon the master. Many of the employments in which laborers are engaged each day are fraught with danger, but the employe, when he enters such an employment, assumes the ordinary risks attendant thereon. It is, however, when an injury results from the negligence of the master that his liability attaches. So, in the case of *Ford* v. *Anderson*, 139 Pa. St. 261 (21 Atl. 18) it was held that "the ground of an employer's liability for injuries received by an employe while operating machinery is not danger, but negligence; and the employe must show by at least a fair preponderance of the evidence that the injury was caused by the negligence alleged. The test of negligence in respect to machinery is the ordinary use of the business; and where there is a failure, not only to show that the machinery was negligently constructed, but how the injury to the plaintiff occurred, it is error to refuse peremptory instructions for the defendant." And in the case of *Simpson* v. *Locomotive Works*, reported in the same volume, on page 245, the court held that, "in an acton for negligence causing the death of plaintiff's husband by the bursting of an emery wheel, there being no evidence showing what caused the wheel to burst, that it was improperly set up, or that there was some defect in it which was known, or might by reasonable diligence have been known, to defendant company, it was not error to order a compulsory nonsuit.

Now, as to the danger attending this work, the section hands had precisely the same opportunity of knowing of its existence, as the section boss. They saw that the tender inclined towards the track, but neither the hands or the boss could see any separation between the bottom and the tender, as it was not apparent. This court has held, in the case of *Woodel* v. *Improvement Co.*, 38 W. Va. 23 (17 S. E. 386) that, "when an employe on a construction train of a railroad company has knowledge of any danger connected with his employment which may be avoided by the use of ordinary care, and appreciates the danger to which he exposes himself, if he continues in such employment after

such knowledge without protest or complaint on his part, or promise on the part of such railroad company that such danger shall be removed, he will be held to have assumed the risk of such danger, and to have waived all claim for damages in case of injury." And in the case of *Kean* v. *Rolling Mills*, 66 Mich. 277 (33 N. W. 395) it was held that "where a foreman and his assistant have equal knowledge of danger accompanying an act about to be done, even if the foreman requests its performance, and injury ensues to the assistant, the employer can not be made liable. Notwithstanding the request in such case made by the foreman, the assistant can comply or not as he chooses, and if he does comply, he takes his chances of the perils surrounding the situation, and in such a case where there is no dispute upon the facts, there is no occasion to go to the jury to determine whether the assistant ought to have obeyed the order of the foreman or not. A servant assumes not only usual and ordinary risks and perils of his master's service when he enters it, but also such other risks as become apparent by ordinary observation." Upon this question of the risks assumed by the servant, Bailey on Master's Liability for Injuries to Servants, on page 180, says: "The servant assumes the risks of the extra hazards and perils by continuing in the employment where he has knowledge of the master's methods, either actual or presumed." "Those extra hazards which thus become known to the employe enter into and become part of the contract." "Where the defect is obvious, knowledge is presumed on the part of such employe of the dangers which it suggests and which are apparent." "The master may rest upon the assumption that the servant knows what is generally to be seen by his observation, suggesting the danger." "The servant must exercise ordinary care to learn the dangers which he may have to encounter." "These considerations control the general rule of the master's duty to furnish a reasonably safe place to work and reasonably safe appliances for the performance of the work." Where the danger is patent the law is stated thus in 78 Mo. 559, in the case of *Aldridge* v. *Furnace Co.:* "If a servant knows of the danger in prosecuting his master's work, or if it is so patent that an or-

dinarily observant man would have seen it, and without any
assurance from the master he continues at work, he can
not hold the master liable if injury result therefrom." See,
also, *Rasmessen* v. *Railway Co.*, 65 Iowa, 237 (21 N. W.
583). In the *Ross Case*, 112 U. S. 382 (5 Sup. Ct. 184) it
was said: "Having been engaged for the performance of
specified services, he takes upon himself the ordinary risks
incident thereto. As a consequence, if he suffers by ex-
posure to them, he can not recover compensation from his
employer. The obvious reason for this exemption is that
he has, or in law is supposed to have, them in contempla-
tion when he engages in the service, and that his compen-
sation is arranged accordingly. He can not, in reason,
complain if he suffers from a risk which he has voluntarily
assumed, and for the assumption of which he is paid." In
order to fix liability upon the defendant in this case it was
necessary, not only that the employer knew or ought to
have known the dangerous condition of the bottom of said
tender, but that the plaintiff was ignorant of it. The tes-
timony, however, shows that the broken condition of the
tender and the severance of the bolts holding the bottom to
the tender were not apparent to either. The falling of this
bottom was merely an unforeseen accident, which, as has
been said, could not have been discovered by the supervisor
or boss by merely using their eyes and looking it over, but
they must have found some means of reaching the frac-
tured bolts before they could have discovered the danger;
and that they were ignorant of the existence of any such
danger is manifest from the fact that they had been work-
ing in the place occupied by plaintiff when he was injured,
a few moments before.

It is not claimed that the plaintiff had any more knowl-
edge of the impending danger in this case than did the
supervisor or section boss, but that he had the same. There
is always more or less danger in working about these
wrecks; but then, as we have seen, the servant assumes
these ordinary risks, and it is only when the servant is ig-
norant of them and his employer is not, and the employer
fails to warn the servant of the danger, that the master's
liability attaches. It is true that a Mr. Koozer, who was

engaged in business for the Pardee & Curtin Lumber Company, was present, as he testifies, when the men went to work at moving this tender. That only one of his men worked at the tender, because he told them not to. He didn't think it was safe. Heard Mr. Rebrook speak to Taylor and say, "Take the men and shove that tender around." That all of his men started to lift and move the tender, and about the time they commenced lifting he gave orders to his men not to go in. This witness was asked if he said anything to Rebrook about it, and replied, "About the time he gave that order, or about the time the men began work, I says (I didn't know his name) 'Man, that ain't safe to put those men in there.' I didn't notice which way he went at that time. He did not make any reply when I made the first remark, and I said, 'Man, I will not risk my men in there.' He then said he thought there was no danger, to 'watch it boys,' or something like that." And when asked where Mr. Rebrook was when he told him a second time, he replied, "He was standing there right at the lower corner—right on the main track just opposite the lower corner—right on the main track." And when asked, "Why did you think it unsafe?" answered: "Because the bottom of that tender—the frame, I believe they call it— was hanging there. You see, the tender set up there, kind of leaning toward the main track, and this bottom frame was loose, and you could get your hand in between the tank and this frame, and it did not look to me as though there was anything holding that, except where it was bound on the bottom, where it was resting on these ties, and that, as quick as they begun to move that, it was bound to loosen." And he further says: "My attention was drawed first by our engineer making a remark to Tom Cunningham: 'I don't see why that frame don't fall back. There is not a bolt or anything to hold it.'" Yet he says Tom Cunningham was lifting at the tender when it fell. And when asked, "Could this tender have been removed by levers or ropes or other methods than that of the crowbars without danger to the men?" replied: "This railroad business is something I never followed, and I don't know much about it. I would not know what kind of tools it

would take to do it with." But he says, "If they had an engine in the lower end of the wreck, they could hitch to it and pull it around." Now the plaintiff himself, in his testimony, says that he did not "notice anything wrong with the tender when he went to lift at it." Mr. Lloyd, the plaintiff's witness, when asked, "Did you see anything about it to indicate danger at the time you went in there?" answered: "No, sir; I never noticed about that at all. I think, if I had seen danger, I would not have went in it." Mr. Bledsoe, a witness for plaintiff, when asked, "Did you see any danger about the thing before they went to lifting at it?" answered, "I didn't see it until after they had went to work." He was asked, "When was it that you saw it was open?" and answered, "It was just before it fell." The plaintiff was recalled, and asked if he heard Mr. Koozer warn his men not to work at that tender, and replied, "No, sir; I didn't." The testimony of the witness Koozer is impeached by five witnesses. Mr. Rebrook, when placed on the stand, stated that he was up at the switch when the accident occurred, one hundred or two hundred yards away. When he told Mr. McIntyre it would look better if the tender was turned around, he went one way, and Mr. McIntyre the other, and did not know of the accident until he heard them halloo, which was only a few minutes after. He denies that Mr. Koozer ever said anything to him as to the danger in removing the tender before the accident; that he ever remarked to Mr. Koozer that he didn't think there was any danger. If any one had suggested it, he would have examined it. And when asked if he saw anything about the tender that would indicate danger, he replied, "I didn't see anything; no sir." And he further states that the bottom would have fallen as soon as it separated if the bolts had been broken. Mr. Steele, the master mechanic of the road, was examined, and stated as to the secure manner in which this bottom was bolted on, and when asked, "If it had gaped from the main body, so that a man could put in his hand, what would have been the result?" stated, "It would have fallen at once, on account of its weight." When asked, "If the bolts were broken, could it easily have been discovered, as

the tender stood on its edge?" answered: "Well, I would not say as to that, from the simple fact that they might have been broken sitting on its edge there, and they might not have come out. From the position they might have stayed in there. They would have had to took hold of the bolts and tried them." The witness Taylor confirms Mr. Rebrook as to where he was when the accident occurred. Heard no remark about the tender being dangerous to handle. Observed nothing about it in a broken condition. He was a section foreman. And it is somewhat remarkable that the testimony shows that there were about forty section hands engaged in clearing up this wreck, yet none of them testify or are called on to testify that they saw any opening between the bottom of this tender and the body of the same. No witness testifies that he saw it but J. A. Koozer. Mr. McIntyre confirms Mr. Rebrook as to his locality when the accident happened. Says he anticipated no danger to the men in working at the tender, as it was leaning in the opposite direction from where they were lifting; that he did not see any gaping or breakage about the fastenings of the tender. He was working at the north end of the tender. Mr. McCann, another section boss, was examined, and stated that he and his men assisted with this work of clearing the wreck; that he was around the tender, but saw nothing to indicate danger to remove it from its position. Mr. Cunningham, one of Mr. Koozer's hands, who was at work at the tender when the bottom fell, says that he saw nothing that indicated danger, and did not hear Mr. Koozer tell his men to keep out. Several witnesses were introduced to sustain the character of Mr. Koozer for veracity. but they had only known him for a year or two, since he lived at Addison, and they stated that his reputation was good in that respect so far as they knew.

Now, when we consider this testimony in connection with the authorities above cited, and the instructions given to the jury on behalf of the defendant, and especially instruction No. 4—in which, among other things, as will be seen by the above instruction, the jury was told that "if it found, from the evidence, that at the time of or just before

the occurence of the accident in question there was nothing in the appearance of the tender of defendant to indicate danger to a person of ordinary knowledge, prudence, and observation, such as would be required in a person to discharge the duties of the positions then held by the witnesses Rebrook and McIntyre, but that to a person skilled in the building or construction of locomotives or tenders such appearance would indicate danger in attempting to remove such tender with crowbars in the manner it was attempted to be moved at the time of the accident, then the jury should find for the defendant, unless the jury should believe that said Rebrook or McIntyre, or either of them, possessed such knowledge of the construction of such tender as to render it obvious or observable, to them or him; that it would be dangerous to attempt to move it with crowbars, or unless it believes, from the preponderance of evidence, that the defendant was negligent in some other respect, and that such negligence was the proximate cause of the injury"—and also consider the instructions given to them in No. 5, my conclusion is that the verdict found was neither warranted by the law nor the evidence.

In my view of this case the question of contributory negligence does not arise. It seems clear to me that neither the supervisor nor the section boss nor the section hands were aware that the bottom of said tender had been dissevered from the main body, or that the bolts that held it were broken, and it does not appear that the supervisor or section boss was guilty of negligence in failing to examine the same more closely than they did.

The judgment complained of is reversed, the verdict set aside, and a new trial awarded, with costs.